2019 IL App (1st) 170150
No. 1-17-0150

SIXTH DIVISION
June 14, 2019

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| | ) | Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 87 CR 8638 |
| | ) | |
| JOHN GALVAN, | ) | |
| | ) | Honorable Timothy Joyce, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant-petitioner John Galvan appeals from the dismissal of his third-stage successive postconviction petition. On appeal, petitioner contends that the trial court erred where it (1) misapplied the standard and made improper factual findings in denying petitioner's actual innocence claims and (2) failed to address several of petitioner's arguments in denying his due process claims. For the following reasons, we reverse the judgment of the trial court, grant petitioner's third-stage successive postconviction petition, and remand.

¶ 2                                    BACKGROUND

¶ 3     For purposes of this appeal, we will include only a brief summary of the facts related to the crime and subsequent trial because those facts are described in detail in both petitioner's direct appeal (*People v. Galvan*, 244 Ill. App. 3d 298 (1993)), and petitioner's appeal from the circuit court's grant of the State's motion to reconsider its motion to dismiss petitioner's postconviction petition (*People v. Galvan*, 2012 IL App (1st) 100305-U).

¶ 4     On September 21, 1986, at approximately 4 a.m., there was a fire at 2603 West 24th Place in Chicago that killed two young men, Guadalupe Martinez and Julio Martinez, who resided with their family in the upstairs apartment of the building. Their siblings, Blanca Martinez (Blanca) and Jorge Martinez (Jorge), escaped. Investigators suspected arson. Petitioner and two other men, Arthur Almendarez and Francisco Nanez, were arrested nine months after the fire and charged with aggravated arson and first degree murder. Following a jury trial, petitioner, who was 18 years old at the time, was convicted of aggravated arson and the murder of the two people who died in the fire. He was sentenced to natural life in prison without parole.

¶ 5     Prior to trial, defense counsel filed a motion to quash petitioner's arrest and suppress his confession. At the hearing on the motion to suppress, Detective James Hanrahan testified that he learned about petitioner's involvement in the fire from a June 7 interview with a witness. Michael Almendarez (Michael), codefendant Almendarez's brother, testified that about nine months after the fire, he was taken into custody between 9:30 a.m. and 10 a.m. and questioned by police officers about the fire. Michael testified that the police officers told him they had witnesses and told him to just sign a statement saying he was there that night. He testified that police officers continued questioning him for eight hours. After about 10 or 12 hours, Michael told police officers that petitioner and Nanez had admitted to him in October 1986 that they had set the fire in question. Michael testified that petitioner and Nanez had not in fact told him that

and that he only signed the statement because the officers told him to. Detective Victor Switski testified that Michael gave his statement at 1 a.m. because "he realized he was assisting us." The trial court denied the motion to suppress.

¶ 6                                     Trial

¶ 7      At trial, evidence was presented that nine months after the fire, police officers had interviewed three individuals who saw several young men in the alley behind the Martinez residence before the fire started. Rene Rodriguez and Jose Ramirez, two young men who admitted to being drunk and were also allegedly high, were being helped home by Frank Partida, who had coached many young men in the neighborhood in baseball and was on his way home from work. Ramirez, the only one of the three who identified petitioner as one of the young men he saw in the alley, was also the only one of the three who testified at petitioner's trial.

¶ 8      Ramirez testified at trial that on the night of the fire he went out with his friend, Rodriguez, and drank "a couple beers." He stated that as he was walking home that night, they encountered Partida. Ramirez testified that as they were walking down the alley, a man he knew as "Michael" turned in his direction. Ramirez claimed that at that point, petitioner also turned around, but Ramirez then walked away. Rodriguez further testified that he left the scene when the fire department arrived because "I didn't want to get involved in telling them anything." Ramirez testified that, in October 1988, a defense investigator came to his work and that he told the investigator that, on the night in question, he was drunk and had not seen anything. He testified at trial that he and Rodriguez drank for about four hours that night, but he was not intoxicated.

¶ 9      Soccoro Flores, a neighbor of the Martinez family, and the only eyewitness to the act of starting the fire, stated at trial that she could not identify any of the individuals responsible, but

saw three young men throw a bottle through the window of the first-floor porch immediately before the fire started. She had viewed a lineup with defendant in it and did not identify anyone in the lineup as someone she saw on the night of the fire. Flores was asked on the stand if petitioner was one of the young men she saw on the night in question and stated, "No."

¶ 10    An arson expert testified that the fire originated inside the porch, six to seven feet above ground level. Broken glass was also recovered from the first-floor porch in the area where the fire started.

¶ 11    Petitioner and his two codefendants, Almendarez and Nanez, signed confessions following their initial interviews with detectives. Petitioner's confession stated that one of the codefendants threw a bottle with gasoline and a lit cloth at the building, it broke but did not ignite, so petitioner walked over to the building and threw a lit cigarette at the wall, causing it to ignite. One codefendant stated that petitioner poured gasoline around the outside of the building prior to the fire.

¶ 12    Petitioner testified that he was handcuffed to a wall after he was brought into the station for questioning and that one of the detectives who interviewed him, Detective Switski, told him that if he agreed to what Detective Switski said, he could leave. He then told petitioner that he would get the death penalty, he was never going home, and he would be "[lying] right next to [his] father." Petitioner testified that he was crying and that Detective Switski told him if he "put the blame on one of them guys and say that they threw the bottle, and I just threw a match on the gasoline, that it wouldn't hurt me, and he wouldn't hold me, that I would be able to go home soon." So petitioner agreed. Petitioner testified that Detective Switski left the room and came back with a notebook, at which point he began making up a story that stated petitioner threw a match on the gasoline, Nanez had thrown a bottle, and they only meant to scare the people in the

house. Petitioner testified that Detective Switski made him go over the story many times. When asked if any police officers "beat" him, petitioner answered, "A couple of hits here and there." He testified that Detective Switski hit him with an open hand, and when he "wouldn't agree on saying what he wanted me to say, he would start hitting me in the back of my head, telling me, [']you know, don't you want to get out of here, don't you want to go home?['] " Petitioner testified that he kept telling Detective Switski that he did not set the fire and was not in the area on the night in question, but that Detective Switski told him if he wanted to go home, he had to say what Detective Switski wanted him to say. Petitioner further testified that he was never alone with the assistant state's attorney and that Detective Switski was always present.

¶ 13    During closing arguments, defense counsel argued that shortly before the fire, there was a "young woman *** out in the street threatening to burn down [the] building" and stated that Rodriguez and Partida did not testify in this case, despite being with Ramirez on the night in question.

¶ 14    The jury found petitioner guilty of aggravated arson and two counts of first degree murder.

¶ 15                              Posttrial Proceedings

¶ 16    This court affirmed petitioner's conviction and sentence on direct appeal. See *Galvan*, 244 Ill. App. 3d 298. Petitioner then filed a postconviction petition in 1995, to which he attached an affidavit executed by Partida. Partida's affidavit stated that both Ramirez and Rodriguez were high the night of the fire and that given the distance and darkness, Partida could not identify the individuals in the alley and he was certain Ramirez could not identify them either. The affidavit further stated that the detectives showed Partida a photo of petitioner and Partida told them he could not identify anyone. The circuit court granted the State's motion to dismiss the petition,

and the ruling was upheld on appeal. See *People v. Galvan*, 286 Ill. App. 3d 1117 (1997) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 17    In 2001, petitioner filed a successive *pro se* postconviction petition. Petitioner attached an affidavit that stated his confession had been coerced and detailed his treatment by Detective Switski during his interrogation. Petitioner then filed three supplemental petitions in March 2003, February 2004, and October 2004. In January 2004, the State filed a motion to dismiss the successive petition based on timeliness. The February 2004 supplemental petition included a claim of actual innocence based on a newly executed affidavit by Partida, in which Partida stated that he did not recognize the young men he saw in the alley that night and, when he asked Ramirez and Rodriguez who they were, Ramirez stated that he did not know. The affidavit further stated that Partida had known petitioner for many years and would have recognized him if he had been in the alley that night. Partida also stated that when the detectives interviewed him, he told them that he knew petitioner and petitioner was not there that night.

¶ 18    The trial court denied the State's motion to dismiss and set the matter for a third-stage evidentiary hearing. The State filed a motion to reconsider the ruling on the State's motion to dismiss. The trial court denied that motion and set a final date for the evidentiary hearing. The trial judge was then transferred to the civil division and for the next 14 months the case was assigned to several different judges. Before a hearing occurred, a new judge took over the case and granted the State's motion to reconsider, dismissing the petition. Petitioner appealed, and in an unpublished order, this court reversed and remanded this case for a third-stage evidentiary hearing on these claims. See *Galvan*, 2012 IL App (1st) 100305-U.

¶ 19    Petitioner presented 23 witnesses at his third-stage evidentiary hearing, which took place over the course of 14 days. Partida testified that in the early morning hours of September 21,

1986, he was working at a bar called Chunkys. He got off of work at 3:30 a.m. and was walking home when he ran into two young men, Ramirez and Rodriguez. Partida testified that Ramirez was helping Rodriguez walk and that it looked like they were intoxicated. Ramirez told Partida that they had been ingesting "wicky sticks," which Partida believed to be marijuana sticks dipped in phencyclidine (PCP). Partida and Ramirez helped Rodriguez walk to a nearby fire hydrant for a drink of water. When they got there, Partida noticed three "young kids" walking toward them. He did not recognize them, and he asked Ramirez if he recognized them. Ramirez told Partida he did not.

¶ 20     Partida testified that shortly thereafter, he heard a woman yelling "fire" in Spanish. Partida stated that the woman was Socorro Flores, and that she came running out of her house telling Partida that "they threw the thing in the window" and that "it's burning." Partida saw the three boys running west down the alley at that time, but he was focused on helping Flores. Partida testified that he was the first one at the scene of the fire and that he helped a woman escape from the second-floor window. Partida stayed at the scene until the two decedents were brought out of the house.

¶ 21     Partida testified that about six to seven months after the fire, two detectives met with Partida at his house. One of the detectives showed Partida pictures of three men and indicated that they were the men who started the fire. Partida recognized two of the men as petitioner and codefendant Almendarez. Partida told the detectives that he knew those two young men from the neighborhood but had not seen them on the night of the fire. Partida testified that his brother, who was a Chicago police officer, talked to Partida after the detectives left and said they had talked to him and "they want me to talk to you about giving up some names or something." Partida agreed to talk to detectives again, on the condition that they were different detectives.

¶ 22    Partida testified that he again spoke to detectives and that he identified petitioner and Almendarez in the pictures as young men he knew. Partida also told the detectives that he was with Ramirez and Rodriguez on the night of the fire and that they were intoxicated. Partida stated that he had seen the police reports that were generated as a result of the two interviews he gave and there were things missing—namely, that the young men were intoxicated and high. Partida testified that while the police report stated that he did not get a good look at the three men in the alley, he actually did get a good look but did not recognize them.

¶ 23    Partida testified that he was never asked to testify at petitioner's trial but that he was approached by petitioner's attorney after trial. He signed three affidavits over the years stating that he did not recognize the three young men he had seen walking in the alley on the night in question.

¶ 24    Partida testified on cross-examination that the first affidavit, dated February 28, 1995, had some information missing but he signed it anyway because he believed it could be changed later. Paragraph nine stated, "I looked down the alley and approximately 100 feet north of where we were standing I saw three figures. Because of the distance and the darkness, I could not tell who these individuals were." Partida also stated in that affidavit that he was positive that neither Rodriguez nor Ramirez "could possibly have identified these individuals." Partida testified that the statement was what he signed but that it was not what he had told investigators. Partida confirmed that his affidavit stated that he had been recently informed that Ramirez testified at trial that he could identify petitioner as one of the three individuals he saw in the alley but that Partida "was positive that this was not possible because of the distance and the darkness."

¶ 25    Partida was then presented with a letter that he had signed, dated July 15, 2002, to which Partida attached an affidavit that had been executed in April 2001. The letter was addressed to

the public defender's office, stating that Partida gave permission for the office to use his affidavit. In that affidavit, Partida stated that when he reached the alley on the night in question, he looked down the alley and approximately 100 feet north of where they were standing, he saw three figures. He stated that because of the distance and the darkness, he could not identify the individuals, and he was positive that neither Rodriguez nor Ramirez could have identified any of the three individuals.

¶ 26    Mary Jane Borys testified at the evidentiary hearing that she was living in the same apartment building as the Martinez family up until the month before the fire and that Blanca was her landlady. She lived with Jose Santos at the time, who was her common law husband. Borys testified that she knew Jorge as Blanca's brother and that she believed he was in the Latin Kings gang. Borys testified that she knew Lisa Velez fairly well through her common law husband and Velez was affiliated with a gang. She stated that she moved out of the apartment building in August 1986, right before she gave birth to her daughter. Borys testified that when she saw news of the fire on television, she thought to herself that Velez had meant what she said when she said she wanted to burn down Blanca's house. Borys testified that this conversation took place about a week before the fire. She stated that Velez mentioned burning the place down on a weekend so that Blanca and Jorge would be there. Borys testified that Velez told her that she would wait until Borys moved out to do anything. Borys testified that Velez stated that she wanted to get even with Blanca. Borys stated that Velez mentioned burning down the building in question in front of Santos and Leticia Figueroa.

¶ 27    Borys further testified that she talked to police on two occasions after the fire. The first time was the evening after the fire, when the police came to talk to Santos. They took Santos to the station for questioning, and several hours later Borys went to the police station. She testified

that she screamed at the police that Santos had nothing to do with the fire and that it was Velez who started it.

¶ 28    Borys testified that sometime within the next seven months, the police asked her to come into the police station for an interview. Borys testified that she gave them a statement and told them that she had been involved in a conversation in which Velez had made threats about burning Blanca's place down. Borys stated that she told police Velez was going to wait until Borys moved out because Borys was pregnant. Borys testified that the police officers took notes, but she never heard from them again and had no idea if anyone was convicted of the crime.

¶ 29    Borys further testified that many years later, she was contacted by the mother of one of the men who was convicted of the crime, and she signed an affidavit that comported with her testimony. On cross-examination, Borys confirmed that she signed her affidavit on November 23, 1996. When asked if she had any concerns about testifying, Borys started to cry and said she was afraid to come to court because she was afraid of what "she" might do if she found out that Borys testified.

¶ 30    Detective Thomas Jones testified that there were multiple witnesses who told him that Velez had made threats to burn down the building in question. This evidence was reflected in police reports wherein Borys, Santos, Figueroa, and Blanca all told police of Velez's threats.

¶ 31    The parties stipulated that Mario Velez, Velez's brother, lived at 2615 West 23rd Place in Chicago in June 1985, and was killed on the sidewalk next door on June 16, 1985.

¶ 32    Petitioner testified at the evidentiary hearing that he was 46 years old but that he had turned 18 just a few days before the fire. Petitioner stated that on the night in question, his girlfriend, Maria Gallegos (Maria), picked him up at this grandmother's house at 2617 West 24th Street. Maria was with her sister, Monica Gallegos (Monica), and they eventually picked up

petitioner's brother, Isaac Galvan (Isaac). Petitioner testified that at 3 a.m., an unmarked police car pulled them over on 25th Street. Petitioner testified that the police officers asked how old Monica was, issued a curfew slip, and then followed them to petitioner's grandmother's house. Petitioner testified that he then went inside and his brother got into his car and went home. Petitioner stated that he did not have a key so his grandmother had to let him in. He took off his shoes and went right to bed. Petitioner testified that he learned of the fire a day or two later.

¶ 33    Petitioner testified that on June 8, 1987, Detective Switski and Detective Hanrahan came to his house and arrested him. They put handcuffs on him and did not tell him why he was under arrest. His brother was also placed under arrest. Petitioner testified that when they got to Area Four police headquarters, he was handcuffed to a wall. Detective Switski then walked out without saying anything to petitioner. Petitioner stated that about half an hour later, Detective Odaya came in and asked if he knew why he was there. When petitioner stated that he did not, Detective Odaya told him that two people had died in a fire in September 1986 and petitioner was responsible for it. Detective Odaya called petitioner a murderer and told him things would get "a lot easier" if he admitted to it. Petitioner denied any involvement. Petitioner testified that Detective Odaya told him he was a liar and that he was going "hang" for this, so petitioner stopped talking to her.

¶ 34    Petitioner testified that Detective Switski came in the room next, about 20 minutes later. Detective Switski asked if petitioner had any gang problems in the neighborhood where he grew up, and petitioner told him about a time in winter 1986 when he had been hit with a baseball bat and robbed. Petitioner also told him that he was driving by the corner of 18th Street and Throop Street and thought he had been shot at by Villa Lobos gang members.

¶ 35    Petitioner testified that Detective Switski then left for an hour or two, and when he came back in the room, he sat down and began writing on a pad of paper. When he was done writing, he showed it to petitioner. He told petitioner it was his voluntary confession. Petitioner testified that he argued with Detective Switski and told him that the information on the pad of paper was not true. Petitioner testified that Detective Switski then grabbed the back of his hair and forced him to look up at him. He began yelling and told petitioner he was going to agree. He then pushed petitioner's head against the wall. Petitioner testified that he was yelling that Detective Switski was hurting him and eventually the detective let petitioner go and said he was going to leave and let petitioner think about it.

¶ 36    Petitioner testified that Detective Switski came back in about a half hour later and his tone of voice had changed. He told petitioner he wanted to help him, and that in order to help him, petitioner had to agree to what Detective Switski had written down. He told petitioner it was the only way he would be able to go home. Petitioner told Detective Switski that he did not commit the crime, whereupon Detective Switski pushed his head down and began punching petitioner in the back of the head. Petitioner testified that he was yelling and crying and that Detective Switski just punched him harder. When he stopped, he kicked petitioner in the leg and said he did not care if the statement was true or not. He told petitioner that he would be lying in a grave next to petitioner's father and that he would shoot petitioner himself if he had to. He then left again, this time leaving the pad of paper with petitioner for him to study until he came back.

¶ 37    Petitioner testified that he was scared at this point. The room was freezing, he was tired and hungry, his back and arms hurt, and he wanted to go home. Petitioner stated that Detective Switski returned about a half hour later. He grabbed petitioner's hair and told him to "tell him." Petitioner said he would not and Detective Switski began punching him again in the back of the

head. Petitioner testified that he then yelled out "okay," and Detective Switski stopped punching petitioner. Detective Switski then held the pad of paper up for petitioner to read and told him to learn it. He left the pad of paper there again and walked out.

¶ 38     Petitioner testified that about a half hour later, Detective Switski came back in and asked petitioner to recite the statement from memory. When petitioner could not do it, Detective Switski punched him in the forehead. Detective Switski hit petitioner about four or five times until he got the story right. Petitioner testified that when he got the story right, Detective Switski told him he was proud and that petitioner was going home. Detective Switski took petitioner out of the handcuffs and said he needed to speak to one other person before petitioner could go home. Detective Switski left again for about an hour.

¶ 39     Petitioner testified that Detective Switski then came back in and escorted him into a different room. There was a man in that room, Assistant State's Attorney (ASA) Joel Leighton, who began reading from the pad of paper. ASA Leighton asked petitioner if it was accurate and petitioner said no. He asked about each statement on the pad of paper, and petitioner said no to each one. Then ASA Leighton left the room and Detective Switski pushed petitioner's head down on the table and told him it was the last time he was going to warn petitioner. About an hour later, Detective Switski and ASA Leighton reentered the room. This time, when ASA Leighton read from the paper, petitioner agreed to everything because he felt like "he had no choice." They then put him in a lineup. Petitioner stated that ASA Leighton told him to repeat his statement to a woman who would type it all out.

¶ 40     Petitioner was then asked if his trial testimony was all true, to which petitioner said it was. He stated that he did not testify at trial about Detective Switski punching and kicking him because his attorney had told him that the jury would not believe him.

¶ 41    Isaac, petitioner's brother, testified that he was arrested on the same day as petitioner, at their mother's house in Cicero. He testified that he could hear yelling, crying, and noises on the wall or table from petitioner's interrogation. Isaac testified that he was questioned for 11 hours before going to a lineup. At the lineup he saw petitioner, who looked "like a zombie" with red and bloodshot eyes and marks on his forehead.

¶ 42    Michael testified that on the night of the fire, he was not with petitioner, his brother Almendarez, or Nanez and did not see Ramirez. Michael testified that nine months after the fire, police officers took him in for questioning. They handcuffed one arm to the wall and began pressuring him to confess to starting the fire. The police officers threatened his life, told him they were going to drop him off in a dangerous area, and they hit him "a couple of times, each of them did." Michael testified that they handcuffed him behind his back and took him to a rival gang's neighborhood and threatened to leave him there. Michael told them that he would confess, so the police officers brought him back to the station. Michael testified that he was questioned for hours at the police station and that police officers eventually wrote out a confession for him to sign that they fabricated. The statement stated that petitioner and Nanez told him that Nanez had thrown a bottle of gasoline against the side of house and that petitioner had lit the gasoline with a match. Michael testified that Nanez did not in fact tell him any of that and that the police officers made that up. Michael said he signed the statement in order to "get out of there." Michael testified that the next morning, they brought him in front of a grand jury and he realized that he:

"had my opportunity to get out of this, and I turned to the Judge, and I told him everything that's on that paper, I did not write, they wrote it, they spoke it, they said it, the only thing true on there is my signature. And right there, he had told

the typist to stop tying and to scratch that, told the officers to get me out of here, they grabbed me, they threw me on the street, and that was it."

¶ 43     Petitioner's attorney called numerous witnesses who testified about their experiences with Detective Switski. Codefendant Almendarez testified that on June 8, 1987, police officers came to his home and asked him if he was willing to go to the police station. He went willingly. Almendarez testified that he was taken to a small room at the police station where an officer backhanded him, grabbed him by the throat, and told him that if he cooperated, "this will all go smoothly." Almendarez testified that several officers, including Detective Switski and Detective Hanrahan, came back and forth to the room and punched, kicked, and grabbed him, telling him he would tell them "what [they] wanted to hear" no matter how long it took and encouraging him to implicate petitioner and codefendant Nanez. Almendarez testified that Detective Switski's threats and abuse resulted in him signing a statement implicating petitioner and Nanez because he believed he could go home if he did so and that he could explain himself later. Almendarez testified that he was taken to Cook County jail and that he told medical staff he was injured, but nothing was done about it. Almendarez testified that he also told his trial counsel about the abuse and a motion to suppress was filed and litigated but ultimately denied.

¶ 44     Anselm Holman, Ritchie Cole, Kenneth Fisher, Freddie Halmon, and LaRoy Mitchell all testified that they confessed to false statements prepared for them by police officers after being interrogated by certain officers, including Switski. Holman testified that he was arrested in May 1984 when he was 17 years old for a burglary. One of the arresting officers was Detective Switski. Holman testified that he was handcuffed in a room and that the officers "became physical" with him. Detective Switski slapped him in the face and punched him in the chest. He was hit in the back of the head with a telephone book. Holman testified that the officers were

telling him that he raped and strangled a woman, but that Holman had no idea what they were talking about. Holman testified that the officers prepared a statement and told him he could leave if he signed it. At that point, he had been at the station for more than 10 hours. The officers then asked Holman to sign a "curfew release." Holman signed and initialed where they told him to on the sheet of paper. Holman testified that he was then taken to jail, where he requested medical attention.

¶ 45    Holman further testified that he told his trial attorney about the abuse he suffered and his trial attorney filed a motion to suppress the statement, but the trial judge did not grant it. Holman was ultimately found guilty and sentenced to natural life in prison. Holman appealed his conviction, but his appellate counsel did not argue for suppression of his statement, and he lost his appeal. Holman ultimately filed a postconviction petition in which he argued that his statement was coerced, which was denied. Holman filed a successive postconviction petition, which was granted. His conviction was eventually overturned, but he pled guilty on remand so that he could get a shorter sentence. Holman stated that he was testifying because he wanted to testify to the mistreatment of and misconduct of Detective Switski and Detective Vucko and that he was not offered anything in exchange for his testimony.

¶ 46    Cole testified that in May 1984, when he was 16 years old, he was arrested for murder. Cole testified that Detective Switski back-slapped him, told him he would never see his school again, slapped him across the face, and kicked him in the buttocks. Cole testified that Detective Switski kicked him a second time and he fell to the floor. Cole testified that he was told to sign a statement and did so without reading it. Cole filed a motion to suppress and told the judge about the abuse but was ultimately convicted. Cole appealed and the statement was thrown out due to

an illegal arrest. The charges against him were eventually dismissed. Cole testified that he was not offered anything in exchange for his testimony.

¶ 47     Fisher testified that he was arrested in May 1984, when he was 17 years old, for the murder and attempted rape of his cousin. Fisher admitted that he took part in the murder of his cousin but testified that he did not sexually assault her. He stated that Detective Switski was one of the detectives that questioned him, and he was handcuffed to the wall during questioning. He stated that the detectives took turns hitting him and he eventually signed a statement that they wrote down for him. Fisher testified that Detective Switski slapped him and punched him several times over the course of the night. Fisher argued at trial and on appeal that his statement should be suppressed but lost. Fisher testified that he did not receive anything in exchange for his testimony.

¶ 48     Frank Cupello, a prosecution investigator, testified that he visited Fisher in jail in 2005 and his report reflected that Fisher described acts of physical abuse during his interrogations by officers, including Detective Switski.

¶ 49     Halmon testified that he was arrested in 1985 for murder. He was 21 years old at the time. Detective Switski and Detective Vucko handcuffed him to a wall, and he was beaten by both officers. The officers left a stack of paper for him to read and told him to memorize his statement. They repeatedly came into the room and took turns hitting him. After two and a half days, Halmon signed the statement the officers wanted him to sign. Halmon told his trial attorney about the beatings, and his trial attorney filed a motion to suppress his statement. The trial judge did not grant his motion. On direct appeal, Halmon was granted a new hearing on his statement, but the hearing was never held. Instead, he was offered a deal of 28 years in jail to plead guilty, and Halmon accepted it. He stated that during the time he had been in jail, he lost a lot of family

members, and he wanted to get out to see his remaining family. He did not know if the motion would get denied again and he would have to spend another 15 years in jail. By pleading guilty, he only had to serve 3½ more years in jail. When asked why he was testifying, Halmon stated that he wanted "the world to hear his story" and that he had not been offered anything in exchange for his testimony.

¶ 50 Mitchell, Halmon's codefendant, testified that he was arrested in 1985 for murder. Mitchell testified that two officers, including Detective Switski, handcuffed him to a wall at the police station and began questioning him. They showed him a piece of paper and told him to memorize the statement. They then began hitting Mitchell in the stomach and the legs. Mitchell testified that they had club-like weapons that they used to beat him. They told him he would never be able to see his family again if he did not agree to what was on the piece of paper. Mitchell testified that they left him alone with the statement and told him to memorize it. Later the next day, Detective Switski took him to a lineup and told him he had been pointed out in the lineup. They then asked Mitchell if he was ready to sign the statement, and when he said no, they began beating him again. Mitchell testified that he then told them what they wanted to hear because he thought he could go home afterwards. Mitchell was taken to jail. He told his public defender what happened, and his attorney filed a motion to suppress. The motion was denied. Mitchell testified that he was found guilty at trial with no other evidence besides his statement and sentenced to 40 years in jail. Mitchell's conviction was reversed for a new suppression hearing, but he was offered a 23-year sentence if he pled guilty, which he accepted so that he could go home to see his family. Mitchell had been serving a 40-year sentence, so by accepting the 23-year sentence, he only had to serve 2½ more years in jail. Mitchell testified that he had not been offered anything in exchange for his testimony and that he chose to testify because he

was "tired of this nightmare, and *** even when I'm on the streets, I see the police. They might stop me for no apparent reason."

¶ 51     Carnell Carey testified that he was arrested in March 1989 for murder and was physically abused by Detective Switski and one other officer. He testified that the officers slapped him in the face and kicked him in the leg. The officers punched and kicked him until he spit out blood. Carey testified that he complained about the abuse when he was taken to jail. Carey testified at a motion to suppress, but the motion was denied. He then pled guilty because he "didn't have a good legal defense." Carey testified that he wrote a letter to the Office of Professional Standards in 1990 and that an investigator contacted him within a week of receiving the letter. Carey further testified that he was testifying at the evidentiary hearing in this case because "these officers need to be stopped. They could still be doing this here. I am not getting anything out of this. It's just that they been doing this for years to people, ain't nothing being done about it and they need to be stopped."

¶ 52     Carey's codefendant, Andre Slater, testified that he was arrested in February 1988 for murder. Slater testified that Detective Switski handcuffed him to a wall, slapped him a several times, and punched him in the forehead and head. Slater testified that he was in custody for three days with nothing to eat and that on the third day he gave his statement. Slater testified that his lip was bloody and his jaw was swollen when he went to jail and that he told someone in the medical processing office at the jail what happened. Slater testified that he told his attorney what happened and filed a motion to suppress his statement, but the motion was denied, and his attorney advised him to plead guilty because he had been offered the minimum sentence. Slater testified that he agreed to testify at the evidentiary hearing because he wanted "some light to be shed on the situation."

¶ 53    Detective Victor Switski, now retired, denied having any memory of the investigation of the case at bar or of taking confessions from petitioner, the testifying witnesses, or other pattern witnesses. He testified that if his reports contained various facts about the investigations, then those facts were true. Detective Switski testified that prior to testifying at the evidentiary hearing, he had talked to Detective Vucko, but that did not refresh his memory. Detective Vucko, who had created reports after speaking to some of the witnesses in the case at bar, denied talking to Detective Switski before the evidentiary hearing and testified that the reports he reviewed did not refresh his recollection of the investigation.

¶ 54    ASA Leighton denied seeing injuries on Michael, Almendarez, or petitioner.

¶ 55    Dr. Russell Ogle, a fire and explosion expert, testified that there was no evidence as to what started the fire in this case. However, Dr. Ogle testified that modern research shows a burning cigarette cannot ignite a flammable vapor. Dr. Ogle also testified that there was no way to determine where the fire started, and that the fire expert's testimony in petitioner's original trial stating that the fire started at the back of the first-floor porch was incorrect. Dr. Ogle testified that the most likely place for the fire to have begun was the stairwell.

¶ 56    The trial court issued a written order on December 15, 2016. In that order, the trial court found Partida's testimony to be "untruthful and not credible," based in part on the prior affidavits that Partida had executed in which he stated it was too dark to see the three individuals in the alley on the night in question. The trial court noted that Partida had also claimed in a letter appended to his 2001 affidavit that it was not possible to identify petitioner on the night in question due to the distance and the darkness. The trial court stated that even if the affidavits had been prepared for him, the letter that he wrote in 2001 was not, and therefore he was either being dishonest then or he was being dishonest now. Consequently, the trial court found that the

outcome of the case would not have been different if the jury had heard Partida's testimony and that such a conclusion prevented a finding that petitioner received ineffective assistance of counsel or that a new trial was warranted.

¶ 57    The trial court also found that any testimony adduced at the hearing regarding a threat made by Velez before the fire took place was not "newly discovered evidence" because it had been introduced at petitioner's trial. The trial court also found that the evidence constituted improper hearsay testimony and therefore could not constitute evidence of petitioner's innocence either then or now.

¶ 58    The trial court further found that after considering all the evidence presented, petitioner failed to meet the necessary burden of proof to entitle him to postconviction relief, and the trial court concluded that the proffered testimony in support of petitioner's claims of coercion "is not to be believed." This conclusion was based on petitioner's "glaring impeachment"—he testified at trial that he was slapped by Detective Switski with an open hand, yet testified at the evidentiary hearing that he was punched with a closed fist in the back of the head numerous times. The trial court did not believe petitioner's testimony at the evidentiary hearing that his trial attorney told him not testify that Detective Switski punched him, kicked him, or threatened to shoot him.

¶ 59    The trial court also found the "so-called" pattern evidence that was introduced was not convincing. Specifically, the trial court stated that it did "not believe any of these persons. They have all been adjudicated guilty of murder. Some have had their convictions reversed by the Illinois Appellate Court, but none have secured any ruling from the Circuit Court or the Appellate Court that their purported confessions were the product of coercion." The trial court stated, without elaboration, that Halmon had been impeached by his prior testimony at his

hearing on a motion to suppress. It further stated that while Mitchell testified that he was beaten by a club, his testimony at a pretrial motion to suppress made no such claims about a club. The trial court stated that Carey did not mention he was spitting blood in his letter to the Office of Professional Standards, and that Holman did not mention that he was told to memorize a written script in his motion to suppress hearing. The trial court stated that Cole wrote two letters in 2005 stating that there had to be something in it for him to get involved and that Fisher's testimony was impeached with his statement to an investigator from the ASA's office that no one coerced him to confess to the murder of his cousin. The trial court concluded that the testimonies of these people were not credible and

> "does not lead to any conclusion that [petitioner and codefendant Almendarez] were coerced to confess their involvement in this case. Neither is this court convinced that had this so-called 'pattern' testimony been presented at [petitioner's and codefendant Almendarez's] pretrial hearings on their motions to suppress their confessions, that such motions would have been granted."

¶ 60    Petitioner's postconviction petition was denied, and he now appeals.

¶ 61                                ANALYSIS

¶ 62    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) provides a statutory remedy for criminal defendants who claim their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. A postconviction proceeding is a collateral proceeding rather than an appeal of the underlying judgment and allows review of constitutional issues that were not, and could not have been, adjudicated on direct appeal. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). "Thus, issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were

not, are considered waived." *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002) (citing *Towns*, 182 Ill. 2d at 502-03). Where a defendant presents newly discovered, additional evidence in support of a claim, collateral estoppel is not applicable because it is not the same "claim." *People v. Tenner*, 206 Ill. 2d 381, 397-98 (2002).

¶ 63    The Act provides three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition that is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2012). However, for a successive petition to even be filed, the trial court must first determine whether the petition (1) states a colorable claim of actual innocence (*Edwards*, 2012 IL 111711, ¶ 28) or (2) established cause and prejudice (*People v. Smith*, 2014 IL 115946, ¶ 34). Since a filed successive petition has already satisfied a higher standard, the first stage is rendered unnecessary and the successive petition is docketed directly for second-stage proceedings. *People v. Sanders*, 2016 IL 118123, ¶¶ 25-28; *People v. Jackson*, 2015 IL App (3d) 130575, ¶ 14 ("When a defendant is granted leave to file a successive postconviction petition, the petition is effectively advanced to the second stage of postconviction proceedings.").

¶ 64    At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). The petitioner's allegations are taken as true, and the question is whether those allegations establish or show a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35. "In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petitioner's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *Id.*

¶ 65 If a defendant makes a substantial showing at the second stage, then the petition advances to a third-stage evidentiary hearing. *Id.* ¶ 34. At a third-stage evidentiary hearing, the trial court acts as fact finder, determining witness credibility and the weight to be given particular testimony and evidence and resolving any evidentiary conflicts. *Id.* The court may receive "affidavits, depositions, oral testimony, or other evidence" to weigh the merits of the petition and determine whether the defendant is entitled to relief. 725 ILCS 5/122-6 (West 2012). We review the circuit court's denial of a postconviction petition following an evidentiary hearing to determine whether it was manifestly erroneous. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). "Manifest error" is defined as "error which is ' "clearly evident, plain, and indisputable." ' " *Id.* (quoting *People v. Johnson*, 206 Ill. 2d 348, 357-60 (2002), quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 66 Here, petitioner claims that he presented newly discovered evidence revealing a pattern of abusive tactics employed by the officer who denied coercing a confession from petitioner. Under Illinois law, "a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable as a matter of due process." *People v. Washington*, 171 Ill. 2d 475, 489 (1996). The supporting evidence for a petition on the basis of actual innocence must be new, material, noncumulative, and of such conclusive character as would probably change the result on retrial. *Id.* New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *People v. Burrows*, 172 Ill. 2d 169, 180 (1996). Material means the evidence is relevant and probative of the petitioner's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). Noncumulative means the evidence adds to what the jury heard. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). And conclusive means the evidence, when considered along with the trial

evidence, would probably lead to a different result. *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009).

¶ 67    As our supreme court has noted, the trial court should not redecide the petitioner's guilt in deciding whether to grant relief. *People v. Coleman*, 2013 IL 113307, ¶ 97. "Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial." *Id.* "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

¶ 68    In light of the evidence of the pattern of misconduct presented at the evidentiary hearing, the questions are (1) whether any of the officers who interrogated petitioner may have participated in systematic and methodical interrogation abuse and (2) whether those officers' credibility at petitioner's suppression hearing or at trial might have been impeached as a result. *People v. Patterson*, 192 Ill. 2d 93, 145 (2000). The issue is not whether the confession itself was voluntary, "but whether the outcome of the suppression hearing likely would have differed if the officer who denied harming the defendant had been subject to impeachment based on evidence revealing a pattern of abusive tactics employed by that officer in the interrogation of other suspects." *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 80.

¶ 69    Petitioner has consistently argued that his confession was coerced at both his suppression hearing and at his trial. At the third-stage evidentiary hearing, petitioner testified that Detective Switski wrote a confession and coerced petitioner into signing it by inflicting hours of physical abuse and promising that petitioner could go home after signing it. Isaac, petitioner's brother, testified that he was arrested on the same day as petitioner and could hear yelling, crying, and noises on the wall or table from petitioner's interrogation. Isaac testified that he was questioned

for 11 hours before going to a lineup. At the lineup he saw petitioner, who looked "like a zombie" with red and bloodshot eyes and marks on his forehead. The trial court made no mention of Isaac's testimony in its conclusions about petitioner's pattern evidence.

¶ 70     Petitioner also presented testimony from various witnesses who had been interrogated by Detective Switski. Codefendant Almendarez testified that police officers came to his home at 10:30 a.m. on June 8, 1987, and asked him to go to the station. At the station, he was taken into a small room, backhanded, grabbed by the throat, and told if he cooperated things would go smoothly. The officers that abused him included Detective Switski and Detective Hanrahan. Almendarez testified that he was punched, kicked, grabbed, and told that he would tell the officers what they wanted to hear no matter how long it took. Almendarez testified that he eventually signed a statement implicating petitioner and Nanez because he believed he could go home afterwards. He informed his trial counsel of the abuse and argued, unsuccessfully, that he was abused at his motion to suppress hearing.

¶ 71     Holman, Cole, Fisher, Halmon, Mitchell, Carey, and Slater all testified that they were abused by Detective Switski during interrogations. Holman testified that Detective Switski slapped him in the face and punched him in the chest. Holman also testified that officers prepared a statement for him and told him he had to sign it. Holman signed it after more than 10 hours of interrogation. Cole testified that he appealed his conviction based on his coerced statement and that the appellate court threw his statement out. Cole's case was dropped on his motion to suppress because he was a minor questioned without his mother present. Fisher testified that Detective Switski slapped and punched him several times over the course of his interrogation and that he argued that his statement should be suppressed before trial and on appeal but lost. Halmon testified that he was beaten by Detective Switski and told to memorize a

statement that had been prepared by police officers. Halmon testified that he signed the statement after 2½ days of questioning. Mitchell testified that he was beaten by Detective Switski with a club-like weapon. Mitchell testified that he was hit on his stomach and legs and interrogated for over a day. He testified that he eventually signed a statement thinking he could leave afterwards. Carey testified that he was physically abused by Detective Switski and complained both when he was booked at the jail and in a letter to the Office of Professional Standards. Carey's codefendant, Slater, testified to similar experiences and testified that he saw Carey with facial injuries in jail.

¶ 72    Detective Switski denied having any memory of the investigation or of taking confessions from petitioner, the testifying witnesses, or other pattern witnesses.

¶ 73    The trial court, after hearing testimony from these witnesses, stated:

"The court has listened carefully to their testimony in that regard and does not find it to be credible. *** This court does not believe any of these persons. They have all been adjudicated guilty of murder. Some have had their convictions reversed by the Illinois Appellate Court, but none have secured any ruling from the Circuit Court or the Appellate Court that their purported confessions were the product of coercion."

¶ 74    However, the credibility findings made by the court were not relevant to the issue of whether Detective Switski's credibility at the suppression hearing might have been impeached as a result of the new evidence that Detective Switski participated in systematic abuse. See *id.* Rather, the questions were whether any of the officers who interrogated petitioner may have participated in systematic and methodical interrogation abuse and whether those officers' credibility at petitioner's suppression hearing or at trial might have been impeached as a result.

*Patterson*, 192 Ill. 2d at 145. Here, without petitioner's confession, the State's case was nonexistent. The witnesses all testified at the evidentiary hearing that they did not gain anything in exchange for their testimony, and several of the witnesses testified that while their convictions were reversed, they plead guilty as a direct result of the State's offer of a lesser sentence. The new evidence presented at the postconviction hearing, when weighed against the State's original evidence, was conclusive enough that the outcome of the suppression hearing likely would have been different if Detective Switski had been subject to impeachment based on evidence of abusive tactics he employed in the interrogation of others. *Whirl*, 2015 IL App (1st) 111483, ¶ 113. Therefore, the trial court's opposite conclusion was manifestly erroneous, and we reverse and remand with directions that petitioner receive a new suppression hearing and, if necessary, a new trial.

¶ 75    Additionally, while we need not address any of petitioner's other arguments, we note that there are several other bases for which we believe the trial court could have granted petitioner's successive postconviction petition following the third-stage evidentiary hearing. Most compelling of those is the newly discovered evidence of Velez's motive to commit this unique crime of arson. At the evidentiary hearing, petitioner presented evidence that Velez's brother was killed in June 1985 by Latin Kings. Borys testified that Jorge, who was living in the Martinez residence at the time of the fire, was a member of the Latin Kings. Jorge confirmed this at trial. Borys testified that about a week prior to the fire, Velez told her that she was going to burn down the building in question. In front of Santos and Figueroa, Velez told Borys about her plans to burn the Martinez residence down. Detective Jones testified that there were multiple witnesses who told him that Velez had made threats to burn down the building. This testimony was

supported by police reports that showed Borys, Santos, Figueroa, and Blanca all told police of Velez's intent.

¶ 76    The State contends that the jury already heard about Velez and that Borys was available to testify at trial and therefore the testimony regarding Velez was not newly discovered evidence. However, at trial, the only testimony elicited that could be construed to have been about Velez was from Jorge, who testified that long before the fire, a "girl" had threatened to burn down the building. There was no introduction of police reports showing the threats that Velez had made, and Borys did not testify as to her knowledge of Velez's threats. Additionally, at the time of trial, the state of mind exception to the hearsay rule required the unavailability of the declarant. Therefore, these threats would not have been admissible since Velez was presumably available to testify. However, today, Illinois Rule of Evidence 803(3) would allow the admission of evidence of these threats or admissions as existing mental or emotional condition regardless of Velez's availability. See Ill. R. Evid. 803(3) (eff. Jan. 1, 2011). The unavailability of the declarant is no longer required under the state of mind exception to the hearsay rule. *Id.*

¶ 77    We find that admissible statements by someone other than petitioner of the intent to commit the very unique crime of arson during the relevant time period is strong evidence of actual innocence, especially in light of the fact that the only evidence against petitioner were his own statements. No physical evidence or eyewitness testimony tied petitioner to this crime, and he contends that his statements were not voluntary. However, because we have determined that petitioner is entitled to a new suppression hearing and, if necessary, a new trial, we need not address petitioner's additional claims for postconviction relief, although as stated above, we find many of them compelling.

¶ 78                                CONCLUSION

¶ 79      For the foregoing reasons, we reverse the trial court's dismissal of petitioner's third-stage successive postconviction petition and remand for a new suppression hearing and, if necessary, a new trial.

¶ 80      Reversed and remanded with directions.